34 C.C.P.A.(Patents)

### Application of WAITE.

### Patent Appeal No. 5208.

Court of Customs and Patent Appeals.

Dec. 9, 1946.

292

Roy F. Steward, of Washington, D. C., for appellant.

W. W. Cochran, of Washington, D. C. (H. S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

Appellant here seeks review and reversal of the decision of the Board of Appeals of the United States Patent Office refusing certain claims of his application for patent on alleged improvements in anodes for electroplating.

Three process claims, numbered 12, 13, and 14, stand allowed.

Eight of the rejected claims, numbered 1, 4, 5, 6, 7, 9, 10, and 11, are process claims. Eleven, numbered 22 to 32, inclusive, are article claims.

At the hearing before us counsel for appellant moved to dismiss the appeal as to claims 1, 5, 6, 7, 9, 10, 11, 22 to 25, inclusive, 28 and 32. The motion will be granted.

So, we are called upon to consider only process claim 4 and article claims, numbered, 26, 27, 29, 30, and 31.

The case presents a somewhat unusual phase, in that while both tribunals of the Patent Office concurred in the view that appellant had made an invention they differed as to whether it lay in the article or in the method of making it.

The examiner denied all the method claims but held article claims 26, 27, and 29 allowable, and said of claims 30 and 31 that they are substantially duplicates, respectively, of claims 26 and 27, and that "No reason is seen to exist for the allowance of these article claims, which, in so far as article features are concerned, are exact duplicates of allowed claims 26 and 27."

The board, on the other hand, took the view that the invention lay only in the method of making the article. It, therefore, reversed the examiner's allowance of article claims 26, 27, and 29 (stating, "A new rejection of allowed claims 26, 27, and 29 is made under Rule 139"), and also reversed his rejection of process claims 12, 13, and 14, which now stand allowed.

We here quote claim 4, the only process claim before us, and claims 26 and 31, which are illustrative of the article claims on appeal:

"4. The process of manufacturing nickel anode metal of good corrodibility for electroplating, which comprises adding to a solution containing nickel a suitable proportion of an organic sulphur-containing compound which is soluble therein and of which the sulfur is at least partly in form available for co-electrodeposition with nickel from said solution in condition adapted to promote corrodibility, and passing an electric current through said solution from a nickel anode to a cathode until an electrodeposit of nickel having sulfur incorporated therewith in active or corrosion-promoting condition, in proportion that is small but sufficient to improve corrodibility, has been built up on the cathode to such substantial thickness that the deposit is sufficiently massive to be self-sustaining and has utility in its electrodeposited condition for anode purposes in the electroplating of nickel."

"26. An electrodeposited nickel anode for electroplating, composed of nickel in electrodeposited condition analyzing at least 99 per cent nickel and containing distributed therethrough co-electrodeposited sulfur in active or corrosion-promoting condition and in proportion greater than 0.001 per cent but not more than about 0.10 per cent, the grain size of the metal being comparable to that of bright nickel; said anode exhibiting good corrosion characteristics when employed in a nickel plating bath of the Watts type at pH values ranging upward to at least about 5.0."

"31. An electrodeposited nickel anode for electroplating, composed of nickel in electrodeposited condition analyzing at least 99 per cent nickel and containing distributed therethrough co-electrodeposited sulfur in active or corrosion-promoting condition and in proportion greater than 0.001 per cent but not more than about 0.10 per cent, together with a small amount of co-electrodeposited carbon, the grain size of the metal being comparable to that of bright nickel; said anode exhibiting good corrosion characteristics when employed in a nickel plating bath of the Watts type."

The statement of the examiner submitted with the appeal to the board embraces the following:

"A brief resume of the art and the problems involved may be helpful in a consideration of this application. In electroplating with nickel, the work to be plated is made the negative electrode (cathode) in an aqueous acid solution containing dissolved nickel, and current is passed through the bath to the work from a positive nickel electrode (anode) immersed in the bath. The nickel ions necessary for the plating operation are supplied to the bath by dissolution or corrosion of the anode. However, the art recognized that anodes made of pure nickel did not corrode satisfactorily, the principal difficulties being that passivity or insolubility would develop and small nickel particles would be detached from the anode and pass into the bath as such, which was not only wasteful of nickel but also likely to cause poor plating. Accordingly, the art sought methods of improving the corrodibility of the nickel anodes, especially when they were made of electro nickel sheet. Proposals looking to that end through annealing or other special heat treatments were made, but they offered no real practical solution of the problem. Then it was discovered that if the nickel contained a sulfur content of from 0.0025% to 0.005%, passivity was eliminated and good corrodibility was obtained. A controlled sulfur content has therefore been standard practice in the art for a number of years prior to the filing of the instant application.

"Providing this necessary percentage of sulfur in anode nickel has usually involved melting down some form of commercial nickel, usually pure electro nickel, and then incorporating into the melt the desired proportion of sulfur, the molten anode metal being then cast into anode form directly or into ingots to be hot rolled into anodes. It is alleged that the manufacture of nickel anodes in this way is expensive, because it involves first, producing high purity electro nickel sheet, in itself a costly operation, and then utilizing this highly refined form of nickel as the starting material in further manufacturing operations; namely, melting down the metal, introducing the required small amount of sulfur, and then casting the anode metal into molds; not to mention the subsequent mechanical working in the case of rolled anodes.

"Applicant alleges that he eliminates these expensive operations by his method because he produces anode nickel and nickel anodes containing sulfur in amount and condition conferring good corrosion characteristics directly by electrodeposition. He achieves this objective by electrodepositing nickel in a suitable form from a bath containing nickel and, in addition, a sulfur compound of such character and present in the bath in such proportion that sulfur is co-deposited with the nickel and is so associated therewith in the resultant electrodeposit as to give the latter excellent corrosion characteristics, when employed as an anode in an electroplating bath in its electrodeposited condition, that is, without melting down and casting as in prior practice."

Six references were listed in the respective decisions of the tribunals of the Patent Office as follows: Gronningsaeter 2,001,385 May 14, 1935; Waite 2,112,818 Mar. 29, 1938; Brown 2,191,813 Feb. 27, 1940; Flett 2,195,409 Apr. 2, 1940; Wesley—Electroplater's Monthly Review Preprint—August, 1938; Eckelmann—Metal Industry, Vol. 32, No. 12—December, 1934—pages 416–418.

As we understand certain of the discussion in the examiner's statement made following the appeal to the board, he, in effect, discarded the Wesley publication as a reference and substituted the Eckelmann (Metal Industry publication) therefor. The board did not refer specifically to either of the publications, but it did expressly hold that the Brown patent "is not a proper reference." It was one of the patents cited by the examiner (the other two being, respectively, Waite and Flett) in the rejection of claim 4. The board said, "The rejection on Brown is not affirmed," but it specifically agreed with the rejection on either Waite or Flett.

The examiner devoted more space to the discussion of process claim 1, which was withdrawn from the appeal to us, than he did to any other process claim, and the brief for appellant did likewise. However, claim

294

4 is similar to claim 1 and, under the board's decision, stands rejected on the same references—that is, either Waite or Flett—and in the oral argument before us counsel for appellant advised the court that the discussion of claim 1 in his brief applies with equal force to claim 4. The examiner said of claim 4: "Claim 4 is slightly more restrictive than claim 1 in that the sulfur containing compound is recited as an "organic" compound. Since each of the references cited against claim 1 clearly describes the addition of an organic sulfur compound to the nickel bath, this claim is also rejected on those references."

The Waite patent is one which was issued to appellant (or his assignee) March 29, 1938, more than a year before the filing date of the instant application, July 24, 1939. It relates to the electrodeposition, or electroplating, of metals, particularly metals of the nickel group, while the instant application relates to the manufacture of nickel anode metal for use in such electroplating.

Stating the matter in a different way, appellant claims to have developed a patentable process of making a nickel article (also claimed to be patentable) adapted for use as an anode in electroplating other metal articles.

It is obvious that the use of the article defined in appellant's application differs from the use of the article defined in his patent, but in considering the method claim, the matter of use of the product is immaterial. The material question is whether the claim presents a process which differs from the process described in his patent and in that of Flett.

■ It was the view of the examiner that the actual steps of appellant's process, as defined in claim 4, are found in the Waite patent and that the intended use of the deposit "cannot make an old process re-patentable." He declared: "A process or method to be patentable should differ from the prior art in the actual procedural operation or step * * *." In his decision he pointed out certain disclosures of the Waite and Flett patents. They are epitomized in the brief of the Solicitor for the Patent Of-

fice before us as follows (reference pages omitted):

"The patent to Waite * * * discloses a process of nickel plating in which there is added to the plating solution a sulfonic acid compound. The patent states * * * that 'Sulfonated aryl compounds in particular are found suitable, whether containing the benzene nucleus or the naphthalene nucleus'. The patent states * * * that the amount of addition agent 'may vary, in the case of the free sulfonic acids, for example, from 1 gram per liter up to saturation'. The deposit of metal is 'relatively thick' * * * or 'nickel plate of any desired thickness and of exceptional brightness may be easily produced'. * * *. The nickel deposited 'also contains on the average in the neighborhood of 0.08 percent of carbon and 0.04 sulphur' * * *.

"The patent to Flett * * * relates to electrodeposition of metals 'by having present in the electrolytic bath a nuclear alkyl derivative of the benzene series (as distinguished from nuclear alkyl derivatives of condensed polynuclear aromatic sulfonic acids, such as, those of the naphthalene series) * * *.' "

The board obviously took the same view as that taken by the examiner respecting claim 4.

We agree with that view. Claim 4 discloses no step which differs from the steps disclosed in the prior art cited—the Waite and Flett patents.

The new step is defined in claims 12, 13, and 14, and was pointed out by the board in its allowance of those claims.

As has been stated, the examiner held article claims 26, 27, and 29 patentable and denied claims 30 and 31, only because he regarded their allowance unnecessary to the protection of appellant's invention since in all material "article features" they are substantially duplicates, respectively, of claims 26 and 27.

It appears from the record that claims 26, 27, and 29 were introduced by amendment during the prosecution of the application before the Primary Examiner, and that they were substituted for other claims, numbered, respectively, 17, 18, and 20. Ap-

parently, this action was taken because of a suggestion contained in "Letter of Examiner, September 25, 1942" (which the board refers to as "Paper 13"), reading: "Claims 17 and 18, as now advised, might be considered allowable, if they were limited to definitely state that the nickel as deposited or in the deposited condition was used as the anode. Also the claims should definitely state that the sulfur is co-electrodeposited. When so corrected the claims may be allowed; * * *."

Appealed claim 29 took the place of original claim 20. It conforms, in substance, to claim 27.

During the prosecution of the case before the examiner appellant introduced an affidavit of a chemical engineer (Dr. A. Kenneth Graham), and the examiner in the letter of September 25, 1942, stated: "The affidavit of Dr. Graham has been considered and it is primarily because of the statements therein that it is thought that article claims such as claims 17 and 18 might be allowable, if amended."

The board's discussion of claims 26, 27, and 29 is as follows: "We note from the record it appears that the allowance of claims 17 and 18 was indicated in Paper 13, if amended to include the use. This was before the date of the decision In re Thuau. These claims eventually became claims 26 and 27. We now are constrained to hold these claims unpatentable. The indicated use cannot confer patentability. Moreover, as previously pointed out, they and claim 29 are too broad because the lower limit of .001% would not assure a satisfactory corrodibility. Finally they do not distinguish from Waite. One of the limitations refers to 'exhibiting good corrosion characteristics * * *.' This is too indefinite a measure. The grain size does not distinguish from Waite since he has a lustrous bright finish and it is known that fine grain size accompanies such finish."

The Thuau case, supra, cited by the board, is a decision of this court, rendered April 5, 1943, reported in 135 F.2d 344, 30 C.C.P.A. (Patents) 979, in which we affirmed a decision of the board upholding a decision of the examiner to the effect that the discovery of a new use for an old composition of matter did not entitle the discoverer of the new use to a patent upon the old composition.

Seemingly, the board took the view that appellant's anode as described in such article claims as are here involved is a composition of matter old in the art and that the examiner allowed the claim solely because of the new use to which appellant applied the article, which, in the opinion of the board, was error, under the rule approved in the Thuau case, supra.

Counsel for appellant argues that the board misconstrued the meaning of the examiner's statement that the claims "might be considered allowable, if they were limited to definitely state that the nickel as deposited or in the deposited condition was used as the anode" and that the amendments made to conform to the examiner's suggestion served "merely to emphasize the intended meaning of the claims as previously standing."

We quote the following from appellant's brief: " * * * it is desired especially to emphasize that, leaving entirely out of account the introductory phrase "An electrodeposited nickel anode for electroplating" contained in each of claims 26, 27 and 29, there is nowhere to be found in the prior art cited by the Patent Office or known to appellant a disclosure of *any* article, whether an anode or not, '*composed of* (i. e. consisting of) electrodeposited nickel in electrodeposited condition' and having even the analysis merely, let alone the further distinguishing property of good corrodibility, set forth in the remainder of each claim. *A self-sustaining body of electrolytic nickel, in its electrodeposited condition, containing co-electrodeposited sulphur in the proportions specified in these claims, is a product heretofore totally unknown, regardless of its intended use.* (Italics quoted.)

Under the decision in the Thuau case, supra (which, it may be said, did not establish any new doctrine or principle of law but merely approved, citing numerous decisions, a principle long followed by the Patent Office tribunals and the courts) appellant would not be entitled to a patent on

an old article, or composition, merely because he applied the composition to a new use, but if he, in fact, made a new composition and properly described and claimed it the Thuau case, supra, has no application here.

We are not convinced that the product as defined in the article claims here involved is a composition of matter which is new. Neither of the tribunals of the Patent Office so regarded it and we do not find any statement in the affidavit of Dr. Graham indicating that the *article* is new. From a careful study of the affidavit we conclude that his discussion related to the *process claims rather than to the article claims*.

The appeal as to claims, numbered, respectively, 1, 5, 6, 7, 9, 10, 11, 22, 23, 24, 25, 28, and 32 is dismissed, and the decision of the board respecting the other appealed claims is affirmed.

Affirmed.